IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Honorable Marcia S. Krieger

Civil Action No. 10-cv-00338-MSK-CBS

ROARING FORK CAPITAL SBIC, L.P.,

      Plaintiff,

v.

ATC HEALTHCARE, INC.;
GOLDSTEIN, GOLUB & KESSLER LLP;
DAVID SAVITSKY;
ANDREW REIBEN;
BERNARD J. FIRESTONE;
JONATHAN J. HALPERT;
MARTIN SCHILLER; and
STEPHEN SAVITSKY,

      Defendants.

_____

## OPINION AND ORDER GRANTING MOTIONS TO DISMISS

_____

**THIS MATTER** comes before the Court pursuant to Defendant Goldstein, Golub &

Kessler, LLP's ("GGK") Motion to Dismiss **(# 33)**, the Plaintiff's ("Roaring Fork") response **(#**

**36)**, and GGK's reply **(# 40)**; and Defendants ATC Healthcare, Inc. ("ATC") and the individual

Defendants' (collectively, "the ATC Defendants") Motion to Dismiss **(# 34)**, Roaring Fork's

response **(# 37)**, and the ATC Defendants' reply **(# 39)**.[1]

## FACTS

The Court sets forth the general factual background here and elaborates as necessary in

_____

[1]The instant motions effectively supersede the Defendants' prior motions to dismiss **(#24,
25)**, and those motions are denied as moot.

1

its analysis.  According to the Amended Complaint (**# 28**), ATC is a healthcare staffing company, headquartered in New York.  Roaring Fork purchased ATC stock pursuant to subscription agreements in 2005, 2006, and 2007.  In connection with each purchase, Roaring Fork considered representations by ATC as to its financial status in ATC's annual 10-K reports, filed with the SEC.  In each instance, GGK had audited ATC's financial reports and had issued opinion letters attesting to the accuracy and completeness of ATC's financial statements.

On October 23, 2007, ATC issued a statement announcing that there would be a delay in its filing of its August 2007 10-Q report, as it had "discovered certain items which may not have been properly recorded in prior financial statements."   On November 13, 2007, Roaring Fork wrote to ATC,[2] raising a variety of concerns, including "ATC's poor operating performance, the disproportionately high salaries of management, and the failure of management . . . to provide shareholder value" along with the "accounting irregularities in its prior financial statements." Roaring Fork noted that ATC's failing to timely file the August 2007 10-Q raised the potential for the AMEX stock exchange, on which ATC stock traded, to delist ATC for failure to comply with AMEX's requirements.  Roaring Fork suggested a variety of remedial measures, including the election of another independent director, the establishment of an independent governance committee, and various policy changes.  Meanwhile, ATC promised AMEX that the August 2007 10-Q would be filed by January 24, 2008.

---

[2]Roaring Fork does not attach a copy of the November 13, 2007 letter (or any of the other documents referenced) to the Amended Complaint.  The ATC Defendants have attached copies of certain documents referenced in the Amended Complaint to their motion, and Roaring Fork has not disputed the authenticity of those copies.  Accordingly, the Court may consider the copies of the documents in ruling on the instant motions.  *Jacobsen v. Deseret Book Co.*, 287 F.3d 936, 941 (10th Cir. 2002)

On December 6, 2007, Roaring Fork wrote a second letter to ATC, taking issue with "a brief letter [Roaring Fork received in response] on November 15, 2007 . . . thanking us for our suggestions and stating they would be carefully reviewed."   Roaring Fork considered this response insufficient, noted that "nothing seems to have improved since our first letter," that "there have been no announcements of any corporate reforms," and that the stock price "is at a five-year low."   Roaring Fork requested "a thorough and constructive response" and "reserve[d] the right to take further action" of an unspecified character.   On December 12, 2007, ATC responded to Roaring Fork's letter, stating that it "had appointed a committee of the independent directors to consider the issues raised by Roaring Fork."   ATC wrote to Roaring Fork again on January 8, 2008, advising that another independent director had been appointed and that "once we have brought him up to date, we will continue work to complete our review of the many issues you raised as quickly as possible."

On January 24, 2008, ATC issued a press release announcing that it would be issuing its August 2007 10-Q within 30 days, and would file its November 2007 10-Q 30 days after that. (This press release neither acknowledged that ATC had failed to meet the deadline for filing the August 2007 10-Q, as it had previously promised AMEX, nor did it offer any explanation as to why ATC had been unable to meet the deadline it had set.)   A few days later, it issued another press release, acknowledging that AMEX had again threatened the possibility of delisting.

On or about February 6, 2008, ATC announced that it had dismissed GGK as its accounting firm.   GGK responded in a public SEC filing on February 12, 2008 that it had "not been notified as to management's view of the scope, nature, or materiality of any errors" in the company's financial records, and thus, GGK was "unable to determine whether the Company's

prior financial statements should be relied upon [and] whether we must withdraw our prior audit opinions." AMEX delisted ATC from its exchange on March 14, 2008. On March 24, 2008, ATC formally withdrew the financial statements is had made in its year-end 10-K for its 2006-2007 fiscal year and its February 2007 10-Q. It announced that it retained a new auditor, but that auditor resigned in October 2009 without having issued any opinion with regard to ATC's prior financial statements. To date, ATC has not issued any corrected financial statements for 2006 or 2007, and has not made any further SEC filings.

Roaring Fork commenced this action on February 17, 2010, alleging two causes of action: (i) securities fraud in violation of section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), against all Defendants; and (ii) "control person" liability under section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a), against the individual Defendants.

GGK moves (# 33) to dismiss the claims against it, arguing: (i) the Court lacks personal jurisdiction over it; (ii) the claims against GGK should be transferred to New York for convenience purposes; (iii) the claims are barred by the two-year statute of limitations; and (iv) the Amended Complaint fails to adequately plead the elements of scienter, reliance, and loss causation.

The ATC Defendants move (# 34) to dismiss the claims against them, arguing: (i) the two-year statute of limitations bars the claims; (ii) the Amended Complaint fails to sufficiently plead the specific misleading statements (or identify the statements made misleading by omission), facts showing the specific acts attributable to each individual Defendant, the Defendants' scienter, and Roaring Fork's reliance; (iii) the Amended Complaint fails to sufficiently plead a claim for control person liability, in that it fails to adequately plead a primary

4

violation and it fails to adequately allege facts showing the control abilities of Mr. Firestone, Mr. Halpert, Mr. Schiller, and Stephen Savitsky; and (iv) the Court lacks personal jurisdiction over Mr. Firestone, Mr. Halpert, Mr. Schiller, and Stephen Shavitsky.

## ANALYSIS

### A. Personal jurisdiction

The Court first turns to questions of whether it has personal jurisdiction over GGK, Mr. Firestone, Mr. Halpert, Mr. Schiller, and Stephen Shavitsky.

#### 1. Standard of review

As the party asserting the existence of personal jurisdiction, Roaring Fork bears the burden of establishing that such jurisdiction exists. *Dudnikov v. Chalk & Vermillion Fine Arts, Inc.*, 514 F.3d 1063, 1069 (10th Cir. 2008). The Court can approach a motion challenging jurisdiction in a variety of ways – on an interlocutory basis, based on the face of the Complaint and any accompanying affidavits; via an evidentiary hearing, etc. *Id.* Where, as here, the Court elects to resolve it on the face of the pleadings and tendered affidavits without conducting an evidentiary hearing, Roaring Fork must simply make a *prima facie* showing of personal jurisdiction via well-pled (*i.e.* non-conclusory) factual averments in the Amended Complaint and any affidavits it tenders, with the Court resolving any genuine disputes of fact in Roaring Fork's favor. *Id.* at 1070. The Court's determination of jurisdiction in such circumstances is interlocutory, and Roaring Fork bears the burden of establishing facts demonstrating the existence of personal jurisdiction at trial. *Id.* at 1069 n. 3

#### 2. Establishing personal jurisdiction

In claims involving federal law, the inquiry into personal jurisdiction has two

components: (i) the defendant must receive proper notice, via valid service of a summons under the appropriate controlling law; and (ii) there must be a constitutionally sufficient relationship between the defendant and the forum. *Omni Capital International Ltd. v. Rudolf Wolff & Co.*, 484 U.S. 97, 104-105 (1987). The parties do not appear to disagree that the Exchange Act authorizes nationwide service of process and that Roaring Fork properly effected service under Fed. R. Civ. P. 4. Thus, the question presented is whether this Court's exercise of personal jurisdiction over the non-Colorado Defendants comports with the constitutional requirement of Due Process.

Congress intended the Exchange Act to extend personal jurisdiction to the full reach permitted by the Due Process clause. *Cascade Fund, LLP v. Absolute Capital Mgmt. Holdings, Ltd.*, 707 F.Supp.2d 1130, 1138 (D. Colo. 2010). The Due Process clause is satisfied when the defendant has sufficient contact with the forum state to ensure that maintenance of the action does not offend traditional notions of fair play and substantial justice. *Id.* Depending on the nature of these contacts, a defendant may be subject to "general" or "specific" jurisdiction. *In re Application to Enforce Administrative Subpoenas*, 87 F.3d 413, 417 (10th Cir. 1996). "General" jurisdiction exists when the defendant has sufficiently "continuous" and "systematic" contacts with the forum, such that it is just and proper to permit the courts of the forum to exercise jurisdiction over the defendant. *Id.*, citing *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 415 (1984). "Specific" jurisdiction arises when the defendant has "purposefully directed" its activities towards the forum and the claims in the underlying action are based upon the defendant's purposeful contacts with the forum. *Id.*, citing *Burger King Crop. v. Rudzewicz*, 471 U.S. 462, 472 (1985). Roaring Fork does not contend that any of the moving Defendants

6

maintained regular and systematic contacts with Colorado,[3] and thus, the Court considers whether it has jurisdiction over these Defendants based upon their "purposeful[ ] direct[ion]" of their activities towards Colorado.

Ascertaining the sufficiency of the Defendants' purposeful direction of their activities into Colorado requires examining both the nature and quality of those contacts, and more abstract questions of whether it is reasonable, in light of those contacts, to exercise jurisdiction. *Cascade Fund*, 707 F.Supp.2d at 1140 ("Where the showing of minimum contacts is weak, a strong showing of reasonableness may favor jurisdiction. Conversely, a strong showing of minimum contacts may be outweighed by a weak showing of reasonableness and may disfavor jurisdiction"). Telephone calls, letters, and other communications by a foreign defendant into Colorado can – in the appropriate circumstances – amount to contacts sufficient to permit personal jurisdiction, but not all communications are of such quality and significance as to satisfy Due Process concerns. *Id.*

Turning first to GGK, Roaring Fork does not contend that GGK directed any particular communications into Colorado, or that it even had any direct communications with Roaring Fork. Rather, Roaring Fork contends that GGK purposefully directed its activities into Colorado by means of two particular actions: (i) "consent[ing] to inclusion of its audit reports in [ATC's] various annual filings with the SEC"; and (ii) "consent[ing] to the inclusion of its audit reports

---

[3]Roaring Fork makes a perfunctory contention that GGK had sufficient contacts with Colorado between 1998 and 2000 when it registered with the Colorado Secretary of State. GGK contends, without contradiction, that the entity that registered in Colorado was a different business entity than the GGK named in this action. In any event, the Court finds that any alleged presence of GGK in Colorado as late as 2000 is insufficient to confer general jurisdiction over acts occurring in 2006 and 2007.

in" ATC prospectuses, "two of which were for the specific purpose of allowing [Roaring Fork]"

to consider whether to invest.  Notably, Roaring Fork does not submit an affidavit or any other

evidentiary material in support of this contention, and thus, the Court looks to the Amended

Complaint for any facts that might disclose the nature and extent of GGK's contacts with

Colorado.

Paragraph 29 of the Amended Complaint explains that in August 2006, ATC filed an S-3[4]

registration statement with the SEC for the purpose of "allowing Roaring Fork, among others, to

resell securities which it had purchased."  The 2006 S-3 identified "41 selling security holders,

of which 29 were identified as being residents of Colorado."  The SEC required Roaring Fork

(and other resellers) to distribute, as part of any sale of its ATC stock, a copy of ATC's

prospectus to the buyer.  Paragraph 31 of the Amended Complaint states that, "as part of the

2006 S-3, Defendant GGK submitted a consent . . . in which GGK consented to the incorporation

by reference in the prospectus . . of their report [certifying ATC's 2005 and 2006 financial

statements]."  Paragraphs 32 and 34 make roughly similar allegations regarding a 2007 S-3 form

that ATC filed with the SEC (allowing 4 stockholders to sell their ATC stock, of which 2 were

from Colorado), which included a consent by GGK that its report certifying ATC's 2004-2006

financial statements could be included in the sale prospectus.

In its response to GGK's motion, Roaring Fork argues that the S-3 form filed by ATC

"is specifically designed to allow" sellers of ATC stock, including Colorado residents like

---

[4]As relevant here, a company must register restricted securities if it wishes for its shareholders to have the opportunity to re-sell them.  ATC's S-3 registrations were made with the specific intent of permitting certain designated shareholders to re-sell their ATC stock to others.  *See generally* 17 C.F.R. § 239.13(b) (listing transactions for which S-3 registration is required).

Roaring Fork, "to rely upon GGK's audit report."  Roaring Fork argues that "to the extent GGK reviewed the Form S-3 registration statement prior to issuing its consent, it would have known that a substantial number of Colorado residents, including Roaring Fork, would be making sales from Colorado in reliance on their report."[5]  From this, Roaring Fork contends that "GGK had significant contacts with Colorado . . . in that GGK consented to the use by a number of Colorado residents of its audit reports for purposes of resales of ATC's securities."

The 10th Circuit addressed a very similar argument in *Trierweiler v. Croxton and Trench Holding Corp.*, 90 F.3d 1523, 1534-35 (10th Cir. 1996).  There, the plaintiff was considering whether to loan funds to the defendant, and the defendant arranged to have a third party, Dublin, pledge bonds that it allegedly held in order to guarantee repayment of the loan.  Relying on an audit of Dublin done by an entity called Wenner, the plaintiff entered into the loan.  The defendant defaulted and Dublin refused to honor its guarantee of the loan, as it did not own the bonds it claimed to have.  The plaintiff brought suit against Dublin, Wenner, and many other entities.  Arising out of a somewhat arcane procedural context, the 10th Circuit was called upon to address the District Court's conclusion that Michigan – the state where the plaintiff originally commenced the action – had personal jurisdiction over Wenner, an entity located in Colorado. The plaintiff argued that Michigan had jurisdiction over Wenner because "Wenner signed its audit [of Dublin], consenting to have it filed with the SEC as part of Dublin's prospectus and

---

[5]This particular argument is phrased by Roaring Fork in a curious way.  Roaring Fork does not – and presumably cannot – allege that GGK did indeed "review the Form S-3" before granting consent.  Roaring Fork is thus left to argue a conditional: <u>if</u> GGK reviewed the form, it would have known that the audit would be disseminated to Colorado.  In the absence of any evidence demonstrating this condition to have occurred, the Court cannot assume that GGK did indeed review the Form S-3 before granting its consent, and thus, cannot assume that GGK knew that its audit report would be specifically dispatched to investors in Colorado.

Form 10. [The plaintiff] claims that this demonstrates Wenner knew its audit would be relied on throughout the United States." *Id.* at 1534.

Noting that "purposeful availment" for jurisdiction purposes "generally requires affirmative conduct by the defendant which allows or promotes the transaction of business within the forum state," the 10th Circuit rejected the plaintiff's argument, finding that "Wenner [did not act] affirmatively to allow or promote business in Michigan." *Id.* at 1535.  The court observed that "Wenner's audit" – performed in Colorado – "was passed on to [the plaintiff] in Michigan by Dublin," and that "there is no allegation that Wenner knew its audit was to be forwarded to Michigan." *Id.*  Addressing the plaintiff's contention that Wenner should have "foreseen" that its consent to Dublin's use of the audit report would induce "reliance" by investors "throughout the United States," the 10th Circuit found that "the mere foreseeability of consequences within the forum state, without more, is insufficient as a basis for jurisdiction." *Id.* The court also rejected an argument by the plaintiff that other courts had found that "by consenting to having its audit filed with the SEC, an auditor becomes subject to jurisdiction anywhere investors and creditors rely on its audit"; the 10th Circuit found that "none of the cases [cited by the plaintiff] stand for the proposition plaintiff advances, and we are unwilling to create such a broad rule for this circuit." *Id.* at n. 6.  The court concluded that "although Wenner might have foreseen reliance, its activities were not enough to constitute purposeful availment," such that Michigan would have had personal jurisdiction over it.  *Id.* at 1535.

This Court sees no material distinction between the facts in *Trierweiler* and those presented here, such that a different outcome would result.  As in that case, GGK is not alleged to have affirmatively taken some action on its own to send its audit report into Colorado; rather,

10

it has simply given consent for ATC to file that audit report with the SEC and distribute it with

ATC's prospectus.  The affirmative act of sending the audit report into Colorado was performed

by ATC, not GGK, and this Court can locate no "affirmative act" by GGK directed specifically

at Colorado.  Roaring Fork argues that GGK should have been able to "foresee" from the

investors listed in the S-3 that investors in Colorado would be receiving and relying upon GGK's

audit report, but as in *Trierweiler*, "foreseeability of consequences" in Colorado, "without

more," is insufficient to give rise to jurisdiction.

Roaring Fork appears to contend that some qualitative difference between GGK giving

consent to have its audit report included in ATC's SEC filings – which it concedes is insufficient

under *Trierweiler* to give rise to jurisdiction – and GGK consenting to ATC's use of its audit

report "in various Form S-3 resale prospectuses" that were created "for the specific purpose of

allowing [Roaring Fork], a Colorado resident, to deliver GGK's audit report as part of a resale

prospectus."  It cites no authority for this proposition, and the Court sees no justification for such

an argument.  *Trierweiler* gives no indication that its decision was driven by the particular nature

of the filing at issue, such that a different kind of filing would have yielded a different result.

Rather, *Trierweiler*'s focus is on the fact that Wenner's audit report was delivered to the plaintiff

in Michigan not by virtue of any affirmative act by Wenner, but by the affirmative act of Dublin.

Although Wenner consented to Dublin's dissemination of the audit report (just as GGK

consented to ATC's distribution of its audit report, whether as part of an SEC filing or a

prospectus), and indeed, although Wenner could have foreseen that the audit report would be

delivered to and relied upon in Michigan (just as GGK could have foreseen from reviewing the

S-3 filing that the audit report would be delivered to and relied upon in Colorado), the absence

11

"affirmative conduct" by Wenner drove the result.  That same absence of affirmative conduct by GGK is present here.

Accordingly, *Trierweiler* compels the conclusion that GGK did not purposefully direct activity into Colorado, and thus, this Court lacks personal jurisdiction over it.[6]  Thus, GGK's motion to dismiss for lack of jurisdiction is granted.

With regard to Mr. Firestone, Mr. Halpert, Mr. Schiller, and Stephen Savitsky's argument that the Court lacks judidiction over them, the Court notes that each of them claim to have had no meaningful contacts with Colorado.  In response, Roaring Fork alleges that each of these individuals – all of whom are identified in the Amended Complaint as "serv[ing] on the Board of Directors of ATC and serv[ing] as a member of the Audit Committee" – signed one or more of ATC's various SEC filings.  Specifically, Roaring Fork's response brief states that each of these Defendants "signed various Forms 10-K and S-3"; that Mr. Halpert "corresponded with Roaring Fork regarding its various [complaint] letters"; and that each of them "signed the 2006 S-3 and the 2007 S-3" that were issued for the specific purpose of enabling Roaring Fork and other shareholders to resell their stock.

Roaring Fork did not submit an affidavit setting forth facts relating to personal jurisdiction over these Defendants, and thus, the Court examines the Amended Complaint to determine what facts Roaring Fork pled regarding these Defendants.  Paragraph 30 alleges that the 2006 S-3 was signed by each of the individual moving Defendants, and paragraph 33 alleges that the 2007 S-3 was signed by each of them.  Paragraph 44 makes a reference to "ATC's

---

[6]Because the Court finds that GGk did not have sufficient meaningful contacts with Colorado, it need not reach arguments regarding whether the quality of those contacts renders the exercise of jurisdiction over GGK reasonable.

representations [as to its financial statements] in its annual and quarterly filings," and states that "Stephen Savitsky['s] certification[ ]" of these filings contained substantial misstatements. Paragraphs 49 and 50 reference Mr. Halpert responding to Roaring Fork's complaint letters in December 2007 and January 2008.  The Amended Complaint goes on to name the individual Defendants in several conclusory paragraphs, *see e.g.* ¶ 102, 111, 114, etc., but the paragraphs discussed above are the only ones that specifically identify particular actions taken by any of the individual moving Defendants.  The Court then turns to the question of whether these allegations are sufficient to make a *prima facie* showing of purposeful contacts directed at Colorado sufficient to warrant the exercise of personal jurisdiction.

The Court turns first to the allegation that these individuals all signed the S-3 forms. Roaring Fork has alleged that the registration statements signed by the Defendants included a notation that investors in Colorado were among those intending to sell the stock pursuant to the S-3, thus putting the Defendants on notice that their attestations to the accuracy of the S-3 and the documents it incorporated would be relied upon by individuals in Colorado.  The Court finds that this is sufficient, at least at this early stage of the litigation where Roaring Fork's obligation is to demonstrate personal jurisdiction to a deferential, *prima facie* level, to show that the Defendants purposefully directed their activities into Colorado.  In *Tracinda Corp. v. DaimlerChrysler AG*, 364 F.Supp.2d 362, 389-90 (D. Del. 2005), the court found that "it is appropriate to exercise jurisdiction over a signatory to SEC documents [in] cases which involve claims directly predicated upon those documents."  *Citing In re CINAR Corp. Securities Litigation*, 186 F.Supp.2d 279, 304-05 (E.D.N.Y.2002) and *Itoba Ltd. v. LEP Group, PLC*, 930 F.Supp. 36, 41 (D. Conn. 1996).  The Defendants argue that Roaring Fork's claims here "do not

relate to any of the information contained in the S-3; they relate to entirely separate filings," but they do not cite to anything in the record that establishes this contention; their only citation is to Roaring Fork's response brief which appears to contend that this is indeed "a dispute over the information contained in the S-3." *Docket # 37 at 25.*

Thus, the Court finds that, by signing the S-3 form, the individual Defendants purposefully directed conduct into the State of Colorado, such that they had sufficient minimum contacts with this forum to permit the exercise of specific jurisdiction over them. But this does not end the jurisdictional analysis. The Due Process clause is violated where the exercise of personal jurisdiction in the chosen forum would "make litigation so gravely difficult and inconvenient that [the defendant] unfairly is at a severe disadvantage in comparison to his opponent." *Peay v. BellSouth Medical Assistance Plan,* 205 F.3d 1206, 1212 (10th Cir. 2000). Thus, a heavy burden shifts to the Defendants to demonstrate that the exercise of jurisdiction in Colorado arises to the level of "constitutionally significant inconvenience." *Id.* In considering whether such inconvenience rises to the point of infringing constitutional protections, the Court considers: (i) the extent of each Defendant's contacts with Colorado; (ii) the nature and extent of the interstate character of the Defendant's business; (iii) the Defendant's access to counsel; (iv) the distance from the Defendant to Colorado; (v) questions of judicial economy; (vi) the situs of discovery and the extent to which such discovery will occur outside the Defendant's state of residence; and (vii) the nature of the regulated activity in question and the extent of impact that the Defendant's activities have beyond the borders of his state of residence. *Id.* Given modern advances in technology and communication, "only in highly unusual cases" will a defendant be able to make the necessary showing. *Id.* at 1212-13.

14

The Court has reviewed the Defendants' submissions on this point, each of which recites the Defendants' residences in New York State and the fact that documents in their possession relating to this matter would be located in New York, along with other facts of minor import. The Court finds these allegations insufficient to carry the Defendants' heavy burden of showing that litigation in Colorado would subject them to inconvenience of a constitutional dimension. Although, as noted above, their only meaningful contact with Colorado was the signing of an S-3 directed at individuals in Colorado, the remaining elements tip in favor of this Court's exercise of jurisdiction. ATC's business involves providing traveling health care workers to medical facilities nationwide; the Defendants are all represented by competent counsel located in Colorado; they make no showing with regard to particular judicial economies that would be lost as the result of this Court's exercise of jurisdiction; and, most notably, securities regulation is an activity having national, not simply local, significance. Although it is likely discovery will have to be conducted in Colorado and New York, and perhaps elsewhere, this Court is confident that modern communications technologies will alleviate any undue burden that remote discovery would impose.

Accordingly, the Court finds that Roaring Fork has made a *prima facie* showing that this Court has sufficient personal jurisdiction over the individual Defendants to allow this action to proceed. Roaring Fork will ultimately have to conclusively establish the basis for personal jurisdiction over the Defendants by evidentiary facts at trial in this matter (if not earlier), but at this stage, the Court finds Roaring Fork's *prima facie* showing of jurisdiction sufficient.

**B. Statute of limitations**

Next, all of the ATC Defendants (including ATC itself) contend that Roaring Fork's

claims are barred by the statute of limitations.  The parties agree that Roaring Fork's claims are subject to a two-year statute of limitations that begins to run on the date Roaring Fork's "discovered" that the Defendants' statements were misleading.  28 U.S.C. § 1658(b).  The parties agree that the Defendants bear the burden of proving what that date is.

The Supreme Court recently addressed the question of when private securities claims accrue for limitations purposes.  *Merck & Co. v. Reynolds*, 130 S.Ct. 1784 (2010).  The Court held that an investor "discovers" a fraudulent statement either when it <u>actually</u> knows the relevant facts or when, "with due diligence," it <u>should</u> have known of those facts.  *Id.* at 1794. The statute of limitations does not begin running until the investor has actual or constructive notice of facts bearing on all the elements of the claim, including the defendant's scienter.  *Id.* at 1796.  The Court rejected an argument that the limitations period begins to run upon "inquiry notice" (or the more colorful term, "storm warnings") – namely, a point when the investor has "a quantum of information sufficiently suggestive of wrongdoing that he should conduct a further inquiry" – but acknowledged that such notice "may be useful to the extent [it] identif[ies] a time when the facts would have prompted a reasonably diligent plaintiff to begin investigating."  *Id.* at 1798.

The Court's holding in *Merck* harmonizes with preexisting authority in the 10th Circuit. In *Sterlin v. Biomune Systems*, 154 F.3d 1191, 1201 (10th Cir. 1991), the court presaged the *Merck* ruling, finding that the statute of limitations begins to run once the investor 'should have discovered the facts underlying the alleged fraud."  At the same time, the court recognized the importance of "inquiry notice" that triggered the investor's duty to investigate further.  It explained that "inquiry notice is triggered by evidence of the possibility of fraud, not full

16

exposition of the scam itself." *Id.* at 1203.  Once an investor is on inquiry notice of fraud, he or she is obligated to investigate the matter with reasonable diligence.  *Id.* at 1204.  *Merck* cites to caselaw acknowledging that the length of such an investigation is fact-dependent; that "a reasonably diligent investigation may consume as little as a few days or as much as a few years to get to the bottom of the matter."  *Id.* at 1798, *quoting Young v. Lepone*, 305 F.3d 1, 9 (1ˢᵗ Cir. 2002).

Here, Roaring Fork commenced this action on February 17, 2010 and thus, the statute of limitations would bar its claims if it either knew or should have known of the misleading character of the Defendants' statements before February 16, 2008.  Thus, the Court examines whether any particular event prior to February 16, 2008 was such that, by that date, Roaring Fork knew or should have known of the false statements.

ATC's difficulties began in October 2007, when it revealed that it had "discovered certain items which may not have been properly recorded in prior financial statements," and that, as a result its August 2007 10-Q report would be delayed.   The question presented is whether this announcement is a "storm warning" sufficient to require Roaring Fork, as a reasonable investor, to investigate further.  To rise to this level, the disclosure must have been sufficient to "raise the possibility" that ATC had knowingly made false representations about its financial status in the past.  *Sterlin*, 154 F.3d at 1203-04.  Cutting through the delicately-worded language of the ATC's announcement – *i.e.* that items "may not" have been properly accounted for – the October 2007 notice acknowledged that ATC believed that certain unspecified prior financial statements contained unspecified errors, and further implied that these errors were of a sufficiently serious quantum that ATC was not willing to file its August 2007 10-Q until the

errors could be addressed.  A reasonable investor would likely have been troubled by ATC's failure to specifically identify the nature or magnitude of the errors it was disclosing.  "Certain items . . . [im]properly recorded" might have been as simple as a few hundred dollars of improperly recorded travel receipts, or it might have been as significant as several million dollars of miscategorized revenues or expenses.  A reasonable investor would not simply have shrugged off this ambiguity and assumed the best; he or she would have sought further detail from ATC about the nature and amount of the particular items of concern.

Presumably, had Roaring Fork sought details of the accounting issues,[7] it would have been advised of some or all of the concerns that were eventually addressed in ATC's March 24, 2008 disclosure of a litany of accounting errors: "accounts that were not properly reconciled which have the effect of inaccurately reporting such items as payroll, payroll advances, payroll taxes and worker's compensation"; "account balances in which the underlying balances had not been verified or documented, such as certain prepaid accounts, miscellaneous receivables, security deposits and accrued expenses"; and "items that were just errors, such as noncash compensation related to certain stock options and overdepreciation of assets."[8]

Roaring Fork's failure to inquire into the nature of the errors first mentioned in October

---

[7]Roaring Fork's November 13, 2007 letter mentions, in passing, ATC's announcement of "irregularities in its prior financial statements," but does not expressly request information concerning those irregularities.  Roaring Fork's demands in the letter primarily involve changes to the director structure and executive compensation reform.

[8]The record does not necessarily reflect whether ATC was aware of all of these various defects at the time of the October 2007 notice, or whether it discovered some of them during its investigation into a smaller number of initial concerns.  Given that ATC's concerns were such that it was not comfortable filing its August 2007 10-Q in light of the concerns it knew of, the Court can reasonably assume that whatever defects ATC did know about in October 2007 were significant.

2007 is particularly significant in light of allegations made by Roaring Fork in the Amended

Complaint.  Roaring Fork identifies various ways in which ATC's internal accounting controls

were deficient during 2006 and 2007, and contends that numerous "red flags" were patently

present, that "obvious and glaring deficiencies" existed, and that "simple tests"by ATC could

have revealed the recordkeeping and accounting errors.  Thus, it is reasonable to assume from

Roaring Fork's allegations that, had Roaring Fork promptly investigated the errors disclosed in

the October 2007 announcement, it would have readily determined that the errors were material

in both nature and magnitude.

The Court notes that the heart of Roaring Fork's allegations of fraudulent statements is

not any specific statement by a Defendant on a particular item of corporate concern, but rather,

generic statements by the Defendants in ATC's public filings, generally attesting to the accuracy

and reliability of its past financial statements. *Docket* # 28-1, ¶ 17, 22, 24, 102-104.  Likewise,

ATC does not allege facts detailing a particular Defendant's scienter with regard to these false

representations regarding ATC's financial statements.  Rather, it relies on the fact that ATC's

accounting errors were so obvious and patent that any reasonable person within ATC would have

been aware of them, and thus, that Defendants' attestations to the accuracy of the financial

statements had to be intentionally false or recklessly made. *Id.* at ¶ 107, 110.  Both these false

statements and the facts Roaring Fork relies upon as proof of scienter (*i.e.* the obviousness of

ATC's accounting errors) were extant as of October 2007.  Thus, diligent investigation into these

matters by Roaring Fork would have disclosed all of the facts necessary to permit Roaring Fork

to bring this lawsuit almost immediately upon Roaring Fork obtaining access to the records in

which the "red flags" and "obvious deficiencies" were evident.

Thus, the Court concludes that ATC's October 2007 acknowledgment of "errors" in its past financial statements – errors that prevented ATC from filing its current financial statements – constituted a sufficient "storm warning" that would have prompted a reasonable investor to consider that such errors were serious (and thus indicia of possible fraud) as to warrant further inquiry to ATC of the nature and magnitude of such errors.  Assuming that diligent investor made a request to that effect at the same time that Roaring Fork did in its November 13, 2007 letter, and received a seasonable response from ATC, that diligent investor could have then requested and obtained access to ATC's books within roughly 60 days[9] – say by mid-January 2008.  As Roaring Fork alleges, the misstatements in ATC's books should have been immediately obvious, and thus, the diligent investor would have immediately recognized that the Defendants' attestations to the accuracy of such obviously defective accounting would have provided all of the necessary elements to bring the securities claims Roaring Fork brings here.  Accordingly, the Court finds that a diligent investor, placed upon inquiry notice into possible fraud by ATC's October 2007 announcement of troubling errors in its past financial statements, could have completed a prompt investigation and discovered the facts necessary to bring a claim by mid-January 2008.  The statute of limitations thus began running as of mid-January 2008 and expired approximately a month before Roaring Fork brought this action.  Accordingly, Roaring Fork's claims are untimely and the ATC Defendants are entitled to dismissal of the claims against them.

---

[9]Roaring Fork acknowledges that it made a request to examine ATC's books in June 2009 and was granted access to those books in August 2009.  The Court reasonably assumes that a request by Roaring Fork to examine the books in or about November 2007 would have been permitted in approximately the same time frame.

20

## CONCLUSION

For the foregoing reasons, GGK's Motion to Dismiss **(# 33)** and the ATC Defendants'

Motion to Dismiss **(# 34)** are **GRANTED**.  All claims in the Amended Complaint are

**DISMISSED**.  The Defendants' prior motions to dismiss **(# 24, 25)** have been superseded and

are **DENIED AS MOOT**.  The Clerk of the Court shall close this case.

Dated this 29th day of March, 2011

**BY THE COURT:**

_Marcia S. Krieger_

Marcia S. Krieger
United States District Judge